Justice Stevens,
dissenting.
When sentencing petitioner Percy Dillon for crack-cocaine-related offenses in 1993, the District Court stated *832 that the punishment Dillon received was “entirely too high for the crime [he] committed.” App. 13. Bound by a sentencing regime that was mandatory at the time, the judge had no choice but to sentence Dillon to 322 months of imprisonment — nearly 27 years behind bars. The judge later explained that, were it within his discretion, he would have sentenced Dillon to five years of imprisonment. Id., at 62. Had Dillon been sentenced after our decision in United States v. Booker, 543 U. S. 220 (2005), the judge would have had substantially more discretion. Instead, the District Court was compelled to mete out a punishment that it believed to be grossly disproportionate to the offense and, therefore, “greater than necessary” to meet the goals of our criminal justice system, 18 U. S. C. § 3553(a).
The punishment Dillon received was so high, in part, because at the time of his conviction our drug laws punished crack cocaine offenses 100 times more severely than powder cocaine offenses. In 2007, as the Court explains, see ante, at 821, the United States Sentencing Commission proposed a partial fix to this disparity, lowering its Guidelines Manual* [1] ranges for crack cocaine offenses to as high as a 20:1 ratio. See United States Sentencing Commission, Guidelines Manual Supp. App. C, Amdt. 706 (Nov. 2009) (USSG) (effective Nov. 1,2007). Pursuant to its congressional mandate, see 28 U. S. C. § 994(u), the Commission made this change retroactive for those individuals, like Dillon, who were still serving sentences for crack cocaine offenses. See USSG Supp. App. C, Amdt. 713 (effective Mar. 3, 2008).
*833 Although Dillon does not have a constitutional right to obtain the benefit of the Commission’s change, it is undisputed that he has a statutory right to do so. Under 18 U. S. C. § 3582(c)(2), a federal prisoner “who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered” by the Commission may seek a sentence reduction, but only after the court “consider[s] the factors set forth in section 3553(a),” and only “if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.” Dillon sought such relief. His 322-month sentence was reduced to a 270-month sentence — still 1714 years more than the sentencing judge thought necessary as an initial matter.
In his § 3582(c)(2) proceeding, Dillon alleged that his circumstances warranted an additional reduction in light of the fact that his sentence was “greater than necessary” to effectuate the goals of our sentencing system, § 3553(a). He also emphasized that he has been a model inmate during his 17 years in federal prison. Once again, however, the District Court felt that its hands were tied, this time because USSG § lB1.10(b)(2) purports to place a mandatory limit on the extent of any sentence reduction that a court may order pursuant to § 3582(c)(2). And so, giving the Commission’s statement the effect of law, the District Court denied Dillon further relief.
Today, the Court holds that in this one limited nook of sentencing law, the Commission retains the power to bind judges that we struck down in Booker. In my view, the Court’s decision to treat the Commission’s policy statement as a mandatory command rather than an advisory recommendation is unfaithful to Booker. It is also on dubious constitutional footing, as it permits the Commission to exercise a barely constrained form of lawmaking authority. And it is manifestly unjust. I would therefore hold that in the context of a § 3582(c)(2) sentence modification proceeding, the *834 District Court may consider, but is not bound by, any applicable policy statements promulgated by the Commission. In other words, I would apply Booker’s remedial holding to § 3582(c)(2) proceedings.
I
Although I did not join Justice Breyer’s remedial opinion for the Court in Booker, it is nevertheless clear to me that its scope applies to § 3582(c)(2) proceedings.
As an initial matter, it is of no moment that the Booker Court did not excise any portion of § 3582 when crafting its remedy. At the time, there was nothing in § 3582(c)(2) — separate and apart from the Guidelines’ general mandatory nature — that would have limited the District Court’s discretion in a § 3582(c)(2) proceeding. There was, consequently, nothing that needed excising. Relief under § 3582(c)(2) is available if it is “consistent with” the Commission’s related policy statement. And when we decided Booker, the particular policy statement at issue, §1B1.10(b), had no explicit binding effect.[2]
Prior to our decision in Booker, the Guidelines were mandatory only by virtue of congressional mandate, and not by *835 virtue of Commission decree. See 18 U. S. C. § 3553(b)(1). Following Booker, the Commission’s policy statement in § 1B1.10 took effect in March 2008. That statement, I will explain more fully in Part II, infra, is now the only source of binding authority in § 3582(c)(2) proceedings, as it purports to have the effect of reinstating a mandatory Guidelines regime within the context of a sentence modification proceeding. It is now the Commission’s policy statement, and not an explicit congressional mandate, that makes the Guidelines ranges binding under § 3582(c)(2).
As a matter of textual analysis, divorced from judicial precedent, it is certainly reasonable for the Court to find that the Commission can set mandatory limits on sentence reductions under § 3582(c)(2). But it is a mistake, in my view, to take such a narrow approach to the question presented by this case. The Court has turned a blind eye to the fundamental sea change that was our decision in Booker.
It is useful to put Booker in context. During the deliberations that led to the enactment of the Sentencing Reform Act of 1984,18 U. S. C. §3551 et seq., 28 U. S. C. § 991 et seq., Congress considered — and rejected — a proposal that would have made the Guidelines only advisory. See Mistretta v. United States, 488 U. S. 361, 367 (1989). Ultimately, the decision to authorize the Commission to issue rules that “have the force and effect of laws” generated a serious debate over the constitutionality of the Commission itself. See id., at 413 (Scalia, J., dissenting).
While we resolved that constitutional debate in the Commission’s favor in Mistretta, it became apparent during the next two decades that the mandatory character of the Guidelines, coupled with the practice of judicial factfinding, not only produced a host of excessively severe sentences but also created an unacceptable risk of depriving defendants of long-settled constitutional protections. See, e. g., Apprendi v. New Jersey, 530 U. S. 466, 490 (2000) (holding that “[o]ther than the fact of a prior conviction, any fact that increases *836 the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt”); Ring v. Arizona, 536 U. S. 584, 602 (2002) (holding that “[i]f a State makes an increase in a defendant’s authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt”); Blakely v. Washington, 542 U. S. 296, 304 (2004) (holding that “[wjhen a judge inflicts punishment that the jury’s verdict alone does not allow, the jury has not found all the facts ‘which the law makes essential to the punishment,’ and the judge exceeds his proper authority” (citation omitted)).
Over a series of cases, we arrived at our present understanding of determinate sentencing schemes: They are constitutionally infirm if they mandate enhanced punishments based on facts found only by a judge by a preponderance of the evidence. By restoring the principles outlined in landmark cases such as In re Winship, 397 U. S. 358 (1970), Ap-prendi and its progeny fundamentally changed the landscape of modern sentencing law,[3] and in so doing paved the way for Booker.
The Booker Court considered whether the Sentencing Reform Act’s mandatory determinate sentencing scheme infringed the jury-trial right. In the first of two opinions, we held that the two applications of the Guidelines before us violated the Sixth Amendment because the sentencing judge in each case imposed a more severe sentence than the facts found by the jury warranted. 543 U. S., at 235. We recognized that if the Guidelines “could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amend *837 ment.” Id., at 233. But we rejected such an advisory reading of the Guidelines, as they then stood. Id., at 234. To satisfy constitutional guarantees, we explained that any fact that has the effect of increasing the mandatory range must be “established by a plea of guilty or . . . must be admitted by the defendant or proved to a jury beyond a reasonable doubt.” Id., at 244. Otherwise, the sentence would violate the Sixth (and the Fifth) Amendment.
In light of the potential for mandatory Guidelines sentences to violate the Constitution, the Court had to elect among possible remedies. As I explained in my dissent from the Court’s second Booker opinion (the remedial one), there was no need to find any constitutional infirmity in any provision of the Sentencing Reform Act to provide relief for the defendants in Booker, or to apply the Guidelines in a mandatory fashion in future cases — so long as juries were allowed to decide the factual issues raised by requests for enhanced sentences. See id., at 272-303 (opinion dissenting in part). Notwithstanding the fact that the Court could have retained the Guidelines’ mandatory prescriptive effect in a manner consonant with the jury-trial right, the Court nevertheless adopted a broad remedy that recast the Guidelines in their entirety.
That change did not respond to a determination that the mandatory Guidelines regime itself violated the Sixth Amendment. Neither my opinion for the Court with respect to our constitutional holding, nor Justice Breyer’s remedial opinion, contained any such determination. Instead, the Court’s decision to make the Guidelines discretionary rested entirely on the majority’s judgment that Congress would have preferred that result to either an increase in the jury’s role in making factual findings or a decision invalidating the entire regime. Id., at 249. When Congress was wrestling with the Sentencing Reform Act of 1984, it did not foresee Apprendi, Ring, and Blakely. The Court made a policy-based prediction that, were Congress to have had such *838 foresight, it would not have elected — in any respect — a mandatory sentencing regime.
The Court openly acknowledged this methodology:
“In essence, in what follows, we explain both (1) why Congress would likely have preferred the total invalidation of the Act to an Act with the Court’s Sixth Amendment requirement engrafted onto it, and (2) why Congress would likely have preferred the excision of some of the Act, namely the Act’s mandatory language, to the invalidation of the entire Act. That is to say, in light of today’s holding, we compare maintaining the Act as written with jury factfinding added (the dissenters’ proposed remedy) to the total invalidation of the statute, and conclude that Congress would have preferred the latter. We then compare our own remedy to the total invalidation of the statute, and conclude that Congress would have preferred our remedy.” 543 U. S., at 249.
Thus, rather than “maintaining the Act as written with jury factfinding added,” ibid., the Court opted to alter the Commission’s power in a more fundamental way: It did away with a fixed, determinate sentencing regime based on mandatory Guidelines. Henceforth the Commission would guide and advise federal courts in the exercise of their sentencing authority. But the Commission would not bind.
The Court held as follows:
“We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U. S. C. § 3553(b)(1) (Supp. IV), incompatible with today’s constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, § 3742(e) (2000 ed. and Supp. IV), whieh depends upon the Guidelines’ mandatory nature. So modified, the federal sentencing statute, see Sentencing Reform Act of 1984 (Sentencing Act), as amended, 18 U. S. C. §3551 et seq., *839 28 U. S. C. § 991 et seq., makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, see 18 U. S. C. § 3553(a)(4) (Supp. IV), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a).” Id., at 245-246.
The only fair way to read the Booker majority’s remedy is that it eliminated the mandatory features of the Guidelines— all of them.[4] It is true that the Court explicitly severed only two specific statutory sections. But there was not, at the time, even a whisper of a suggestion that any other mandatory provision existed or that any should be preserved.[5]
Were it not clear from the foregoing discussion of Booker itself, our post-Booker decisions have repeatedly emphasized the completely advisory nature of the Guidelines. See, e. g., Cunningham v. California, 549 U. S. 270, 286-287 (2007) (“Under the system described in Justice Breyer’s opinion *840 for the Court in Booker, judges would no longer be tied to the sentencing range indicated in the Guidelines. But they would be obliged to ‘take account of’ that range along with the sentencing goals Congress enumerated in the [Sentencing Reform Act of 1984] at 18 U. S. C. § 3553(a)”); Rita v. United States, 551 U. S. 338, 351 (2007) (“[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply”); Gall v. United States, 552 U. S. 38, 46 (2007) (“As a result of our decision [in Booker], the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are ‘reasonable’”); Kimbrough v. United States, 552 U. S. 85, 101 (2007) (“In sum, while the statute still requires a court to give respectful consideration to the Guidelines, Booker permits the court to tailor the sentence in light of other statutory concerns as well” (internal quotation marks and citation omitted)); Spears v. United States, 555 U. S. 261, 265-266 (2009) (per curiam) (“[W]e now clarify that district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement with those Guidelines”).[6] Our case law is quite *841 clear: The Guidelines no longer have mandatory and binding effect, and the sentencing court may not presume them correct or reasonable when it considers an individual sentencing decision.
In light of this history, the limited nature of the § 3582(c)(2) proceeding is beside the point. Nothing turns on whether the proceeding is best understood as a resentencing or as a sentence modification procedure. Nor is it relevant that Dillon has no right to be present at a proceeding under § 3582(c)(2), ante, at 828, or that a sentence reduction proceeding may not be “constitutionally compelled,” ibid. The Court’s general reliance on Booker in this case, see ante, at 830, is odd because the Booker Court explained its belief “that Congress would not have authorized a mandatory system in some cases and a nonmandatory system in others,” 543 U. S., at 266. Yet, this is precisely the system the Court approves today.
Approaching this case as the Booker Court did, one must ask whether it is likely that a fully informed Congress would have created this kind of Commission: one endowed with vast responsibilities for drafting advisory Guidelines and policy statements, but also with the tiniest sliver of lawmaking power to tie the hands of a district court’s exercise of grace under § 3582(c)(2). I think the answer is obvious.
II
My understanding of the scope of the Booker remedy is reinforced by an additional consideration: The Commission’s policy statement, to which the Court today allows binding effect, may exceed the scope of the Commission’s powers. No one disputes that Congress could have rejected the Court’s remedial holding in Booker if it so wished. Instead, it is the Commission that has rejected Booker’s application to § 3582(c)(2), by purporting to give mandatory force to its own policy statement. That action presses the bounds of the authority Congress validly gave the Commission in 1984, for it is not clear that Congress has authorized the Commis *842 sion to create this type of policy statement or to circumvent a decision such as Booker on its own accord.
We have been quite permissive of congressional delegations in our separation-of-powers jurisprudence. “So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.’” Mistretta, 488 U. S., at 372 (quoting J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 409 (1928)). New legislative actions have been found to offend this principle. 488 U. S., at 373.
More than 20 years ago, the Court upheld the constitutionality of the Commission’s work from just such an attack in Mistretta. We took sanctuary then in the fact that, in enacting the Sentencing Reform Act and creating the Commission, Congress had “se[t] forth more than merely an 'intelligible principle’ or minimal standard]” for the exercise of the Commission’s discretion, and had “ 'explained] what the Commission should do and how it should do it, and se[t] out specific directives to govern particular situations.’ ” Id., at 379. To this end, Congress gave the Commission clear “goals,” id., at 374; specified the '"purposes of sentencing,’” ibid.; “prescribed the specific tool” — “the guidelines system” — the Commission was to use in its work, ibid.; set limits on the appropriate Guidelines ranges the Commission was to promulgate, id., at 375; and set forth “seven factors” and “11 factors,” respectively, to assist the Commission with “its formulation of offense categories” and its establishment of “categories of defendants” for sentencing purposes, id., at 375-376.
We explained that “although Congress granted the Commission substantial discretion in formulating guidelines, in actuality it legislated a full hierarchy of punishment — from near maximum imprisonment, to substantial imprisonment, to some imprisonment, to alternatives — and stipulated the *843 most important offense and offender characteristics to place defendants within these categories.” Id., at 877. There was, accordingly, no “concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the ‘hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.’” Id., at 382 (quoting INS v. Chadha, 462 U. S. 919, 951 (1983)).
Justice Scalia disagreed. He argued forcefully that Congress’ creation of the Commission was itself “a pure delegation of legislative power” and therefore an abuse of separation of powers. 488 U. S., at 420 (dissenting opinion). “Congress’ commitment of such broad policy responsibility to any institution,” in Justice Scalia’s view, violated a core principle of our governing system: that “basic policy decisions governing society are to be made by the Legislature.” Id., at 415.
Although we acknowledged in Mistretta that Congress had permissibly granted substantial powers to the Commission to set law and policy on sentencing generally, we had no occasion to consider whether it had spoken with sufficient clarity respecting the Commission’s authority to prescribe sentence reductions. That question has now reared its head, and in my view it raises separation-of-powers concerns significantly more difficult than those presented in Mistretta.
First, I am doubtful that Congress authorized the type of “policy statement” we find in USSG § 1B1.10. Congress instructed the Commission to promulgate “general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in section 3553(a)(2) of title 18 . . . including the appropriate use of,” inter alia, various “sentence modification provisions.” 28 U. S. C. §994(a)(2). As envisioned by the Sentencing Reform Act, the role of policy statements was merely to inform the judge’s exercise of discretion within *844 an otherwise mandatory Guidelines regime. See S. Rep. No. 98-225, p. 167 (1983) (explaining that the “sentencing judge is required to take the policy statements into account in deciding what sentence to impose,” but that departure from a policy statement is not itself grounds for appeal); see also id., at 166 (identifying potential use of policy statement to “offe[r] recommendations as to how” to “trea[t]” “in the future” “existing disparities which are not adequately cured by the guidelines”). Congress reserved binding effect for the Commission’s “guidelines,” which the Commission was to promulgate pursuant to a distinct statutory provision, § 994(a)(1). The Sentencing Reform Act thus drew a basic distinction: Guidelines would bind; policy statements would advise.
Given that distinction, it is significant that Congress elected to use the Commission’s policy-statement power to set limitations on the sentencing modification procedures, rather than invoking the Commission’s Guidelines power. The Commission is now trying to use a policy statement to have the mandatory effect of a guideline — inverting the Sentencing Reform Act’s original design. I find no provision within § 994(a)(2) that would authorize the Commission, via a policy statement, to create a binding Guidelines regime. With respect to the type of action the Commission has taken, there is certainly no provision that even approximates the detailed prescriptions on the Commission’s power we considered in Mistretta.
Moreover, not only does nothing in § 994(a)(2) appear to authorize this type of policy statement, but there is also nothing that appears to authorize the Commission, by its own fiat, to limit the effect of our decision in Booker.
How to respond to Booker, and whether to retain mandatory Guidelines, was a decision for Congress — and Congress alone. Booker expressly left “[t]he ball” “in Congress’ court,” explaining that “[t]he National Legislature is equipped to devise and install, long term, the sentencing sys *845 tem, compatible with the Constitution, that Congress judges best for the federal system of justice.” 543 U. S., at 265; see also supra, at 834-835. That Congress has declined to disturb Booker in the five years since its issuance demonstrates not only that Justice Breyer is more clairvoyant than I am, but also that Congress has acquiesced to a discretionary Guidelines regime. Congress’ silence has deprived the Commission of any “intelligible principiéis],” J. W. Hampton, 276 U. S., at 409, by which to steer its consideration of the appropriate response to Booker. And without such guidance, I fear that, in promulgating USSG § 1B1.10, the Commission may have made the type of “basic policy decisio[n]” that Justice Scalia reminded us is the province of the Legislature, Mistretta, 488 U. S., at 415 (dissenting opinion).
Prior to the Commission’s 2008 overhaul of its policy statement in § 1B1.10 — and even under the applicable policy statement in effect when the Court decided Booker — nothing in the Guidelines, see supra, at 834-835, and n. 2, as understood in light of Booker, would have precluded Dillon from obtaining the type of discretionary sentence reduction he now seeks (assuming he was so eligible). Standing in Dillon’s way presently are two provisions of § IB 1.10, revised contemporaneously with the Commission’s decision to make its amendments to the crack cocaine offense Guidelines retroactive.
There can be no question that the purpose of the Commission’s amendments to its policy statement in § IB 1.10 was to circumvent the Booker remedy. See Brief for Federal Public and Community Defenders et al. as Amici Curiae 3-9 (describing history of promulgation of current version of § IB 1.10). To this end, the Commission disclaimed that proceedings under § 3582(c)(2) “constitute a full resentencing of the defendant.” USSG § lB1.10(a)(3). And it advised that “the court shall not reduce the defendant’s term of imprisonment under 18 U. S. C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range determined” under the new range. *846 § 1B1.10(b)(2)(A). In other words, the Commission told federal courts that its Guidelines, at least in § 3582(c)(2) proceedings, remain mandatory and binding.
Had the Commission taken it upon itself, by issuance of a general policy statement, to make its Guidelines mandatory but subject to jury findings in all cases, we woúld either strike down such an act on separation-of-powers grounds or apply the same remedy we did in Booker to render the statement advisory. It makes little difference, in my view, that the Commission has only rejected the Booker remedy in this single procedure. The encroachment is the same, if only more subtle. Any legislative response to Booker was a decision for Congress to make — not the Commission.
Ill
Separate from the arguments noted above, the Court's decision today may reflect a concern that a contrary holding would discourage the Commission from issuing retroactive amendments to the Guidelines, owing to a fear of burdening the district courts. In what might be described as a subtle threat, the Commission has highlighted this point in its ami-cus brief supporting the Government. The brief explains that holding for Dillon would introduce uncertainty into the Commission's “assessments about the effects of retroactivity decisions,” making these decisions “very difficult” and “weighing] against making Guideline amendments retroactive in the future.” Brief for United States Sentencing Commission as Amicus Curiae 21.[7]
Even if that explanation were accurate, it should not influence our assessment of the legal question before us. The Commission has a statutory obligation to review and amend *847 Guidelines ranges. 28 U. S. C. § 994(o). And Congress has commanded that the Commission “shall specify in what circumstances” an amendment is retroactive, indicating that most, if not all, substantial amendments are to receive some type of retroactive effect. §994(u); see also S. Rep. No. 98-225, at 180 (“It should be noted that the Committee does not expect that the Commission will recommend adjusting existing sentences under [§ 3582(c)(2)] when guidelines are simply refined in a way that might cause isolated instances of existing sentences falling above the old guidelines or when there is only a minor downward adjustment in the guidelines”). In other words, while Congress has left the retroactivity decision to the Commission’s discretion, it has done so with the presumption that some form of retroactive relief is appropriate when a Guidelines amendment is nontrivial.[8] I cannot accept that the Commission would ignore its obligations, and would withhold retroactive application of a Guidelines reduction, simply because a judge would *848 have discretion to enter a below-Guidelines sentence in a § 3582(c)(2) proceeding.
Undoubtedly, discretionary application of the Guidelines in § 3582(c)(2) proceedings would impose a greater burden on the district courts. Such a process would require case-specific evaluations rather than the rote, two-level reductions the Commission envisioned when it made Amendment 706 retroactive. But it is important to remember that § 3582(c)(2) already requires the district court to consider the § 3553(a) factors when it determines whether to grant a reduction, as well as the extent of the reduction. And any additional consideration of evidence proffered to justify a downward departure need not create a great deal of work. Indeed, it need not create any particular adversarial process at all: The Commission could simply advise the district courts to review paper submissions, including the original presentenee report and objections, as well as any new submissions. By now, courts are intimately familiar with our post-Booker sentencing regime and the discretionary application of the § 3553(a) factors.
The facts of Dillon’s case show why any additional burden on the courts caused by applying Booker’s remedial holding likely pales in comparison to the benefit of achieving more tailored, proportionate sentences for those individuals currently serving terms of imprisonment that exceed what is “necessary” to meet the goals of our sentencing system, § 3553(a). Dillon was 23 years old when he was sentenced to nearly 27 years’ imprisonment for his drug crimes. His attorney urged the District Court to enter a below-Guidelines sentence because of, inter alia, the gross disparity between sentences for crack and powder cocaine offenses. App. 8-9. It would take another 14 years for this Court to agree, finally, in Kimbrough, 552 U. S. 85, that sentencing courts could consider this unjust disparity.
But the District Court, constrained by the then-mandatory Guidelines, increased Dillon’s sentence based on judge-found *849 facts by more than 10 years over the sentence authorized by the jury’s verdict. See Brief for Petitioner 2, and n. 2. The court could only lament: “I personally don’t believe that you should be serving 322 months. But I feel I am bound by those Guidelines and I don’t feel there is any grounds for... departing] from those Guidelines.” App. 12-13. The court acknowledged: “I don’t say to you that these penalties are fair. I don’t think they are fair.” Id., at 13. The court also implored Dillon to make something of the hand he had dealt himself: “I hope that while you are in prison . . . that you will take some time to consider the direction that your life will take when you do return to society.... It is only through people like you if you spread the word that other young men of your age will hesitate to get involved in [dealing drugs].” Ibid.
Dillon has done just that. He has participated in outreach efforts in the communities in which he has been imprisoned, doing extensive work with adolescents to steer them away from a life of drugs and crime. Brief for Petitioner 5-6. Working with two universities, he has facilitated the initiation of an African-American Studies program at Hunters Point Family, a bay area organization devoted to assisting at-risk youth. He has also played a large role in initiating a similar program at his prison facility. Berkeley’s Prison Outreach Coordinator stated to the District Court that “without [Dillon’s] insight and advice, our project would not have succeeded and grown the way it has.” Id., at 6 (internal quotation marks omitted). Dillon has also prepared himself for a successful life once he returns to society. He has obtained his general equivalency diploma (GED), taken vocational classes in property management, and has job prospects awaiting him upon release. Id., at 6-7.
The Government concedes that Dillon has undertaken “significant institutional rehabilitation and education.” Brief for United States 11. The Court of Appeals acknowledged that “[i]f Booker did apply in proceedings pursuant to *850 §3582, Dillon would likely be an ideal candidate for a non-Guidelines sentence.” 572 F. 3d 146, 147 (CA3 2009). And yet, now, the Government will continue to spend more than $25,000 a year to keep Dillon behind bars until his release date.[9]
Given the circumstances of his case, I can scarcely think of a greater waste of this Nation’s precious resources. Cf. Barber v. Thomas, ante, at 494 (Kennedy, J., dissenting) (“And if the only way to call attention to the human implications of this case is to speak in terms of economics, then it should be noted that the Court’s interpretation comes at a cost to the taxpayers of untold millions of dollars”). Dillon’s continued imprisonment is a truly sad example of what I have come to view as an exceptionally, and often mindlessly, harsh federal punishment scheme.
IV
Neither the interests of justice nor common sense lends any support to the decision to preserve the single sliver of the Commission’s lawmaking power that the Court resurrects today. I had thought Booker dismantled the mandatory Guidelines regime. The Court ought to finish the job.
I respectfully dissent.

 The Guidelines Manual itself contains two types of provisions: guidelines, see 28 U. S. C. § 994(a)(1), and policy statements, see § 994(a)(2). I use “Guidelines” in this opinion to refer to both the guidelines as described in § 994(a)(1), as well as more generally to all of the provisions in the Guidelines Manual. The section numbers of both types of provisions are enumerated identically within the Commission’s Guidelines Manual, but their effects, as discussed in more detail herein, are different.

 From 1989 to 1994, the policy statement in § 1B1.10 also contained what could be described fairly as a limitation on the “amount” of an available sentence reduction. See USSG § lB1.10(c)(2) (Nov. 1990) (“[A] reduction in a defendant’s term of imprisonment . . . may, in no event, exceed the number of months by which the maximum of the guideline range applicable to the defendant. . . has been lowered”). In 1994, as part of Amendment 504 to the Guidelines Manual, the Commission deleted this provision, explaining that this “rather complex subsection” was an “unnecessary restriction on the court’s consideration of a revised sentence.” USSG App. C, Arndt. 504 (effective Nov. 1, 1994). Later, in an “Application Note,” the Commission indicated that “the amended guideline range” “limit[s] the extent to which an eligible defendant’s sentence may be reduced.” Id.., Arndt. 548 (effective Nov. 1, 1997). The bottom line is that it was the Guidelines’ mandatory nature, and not the effect of a policy statement, that made the Guidelines ranges binding in an 18 U. S. C. § 3582(c)(2) proceeding.

 See United States v. O’Brien, ante, at 235-236, and n. 1 (Stevens, J., concurring) (discussing a significant sentencing policy trend in 1970’s and 1980’s, involving a shift to mandatory, determinate sentencing schemes based on judicial factfinding by a preponderance standard).

 See also, e. g., Booker, 543 U. S., at 246 (opinion for the Court by Breyer, J.) (“The other approach, which we now adopt, would (through severance and excision of two provisions) make the Guidelines system advisory while maintaining a strong connection between the sentence imposed and the offender’s real conduct — a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve” (emphasis added)); id., at 254 (“Congress would have preferred no mandatory system to the system the dissenters envisage”); id., at 264 (“Finally, the Act without its ‘mandatory’ provision and related language remains consistent with Congress’ initial and basic sentencing intent.... The system remaining after excision, while lacking the mandatory features that Congress enacted, retains other features that help to further these objectives” (emphasis added)); ibid. (“The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing” (emphasis added)).

 It seems, however, that at least one additional provision of the Sentencing Reform Act should have been excised, but was not, in order to accomplish the Court’s remedy. Section 3742(g)(2) prescribes that the Guidelines are to have binding effect upon a remand for a new sentence in a direct appeal: “The court shall not impose a sentence outside the applicable guidelines range ....”

 See also Spears, 555 U. S., at 267 (“[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no ‘particular circumstances’ that would otherwise justify a variance from the Guidelines’ sentencing range”); Kimbrough, 552 U. S., at 101 (“The Government acknowledges that the Guidelines ‘are now advisory’ and that, as a general matter, ‘courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines’”); id., at 113-114 (Scalia, J., concurring) (“[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines. If there is any thumb on the scales; if the Guidelines must be followed even where the district court’s application of the § 3553(a) factors is entirely reasonable; then the ‘advisory Guidelines would, over a large expanse of their application, entitle the defendant to a lesser sentence but for the presence of certain additional facts found by judge rather than jury. This, as we said in Booker, would violate the Sixth Amendment”); Gall, 552 U. S., at 50 (sentencing court “may not presume that the Guidelines range is reasonable”).

 The Government’s argument along these lines is less subtle: “To forbid the Sentencing Commission from limiting the scope of Section 3582(c)(2) sentence reduction proceedings to the scope of the amendments themselves would inevitably discourage the Sentencing Commission from ever authorizing sentence reductions.” Brief for United States 37.

 As the Court notes, I do agree that §994(u) authorizes the Commission to determine the retroactive effect of sentence reductions. Ante, at 830. I understand § 994(u) as directing the Commission to prescribe the retroactive effect, if any, of its Guidelines amendments. The power to make retroactivity determinations is meaningfully different, however, from the other power the Court claims for the Commission. In granting the former power, Congress has instructed the Commission to perform a gate-keeping function by determining which individuals are eligible for relief pursuant to § 3582(c)(2). By contrast, the other power the Court claims for the Commission today is the type of mandatory sentencing authority at issue in Booker. Contrary to the Court’s conclusion, the Commission after Booker does not have the power to bind the district court in setting a particular sentence.
I also cannot accept the Court’s broad understanding of the power the Commission derives from § 994(u), see ante, at 826, because it suffers from the same delegation concerns I discussed above, see supra, at 841-846. I do not think the Commission’s authority encompasses the ability to promulgate binding Guidelines via policy statements. And this matter is separate from its power to promulgate Guidelines — a power unaffected by our decision in Booker.

 See Hanlon, Heeker, & Gopstein, Expanding the Zones: A Modest Proposal To Increase the Use of Alternatives to Incarceration in Federal Sentencing, 24 ABA Criminal Justice, No. 4, pp. 26,28 (Winter 2010) (“In fiscal year 2008, it cost $25,894.50 to incarcerate an offender in a federal Bureau of Prisons facility for 12 months”).